UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | **17-cr-128 (ARR)** |
| — against — | **Not for print or electronic publication** |
| DARREN ELLIOTT, | **Opinion & Order** |
| Defendant. | |

ROSS, United States District Judge:

Defendant Darren Elliott moves pursuant to 18 U.S.C. § 3582(c)(1)(A) for compassionate release. The government opposes. For the reasons set forth below, Elliott's motion is denied.

## BACKGROUND

Defendant Darren Elliott participated in one robbery and two attempted robberies of various jewelry stores in Franklin Square, New York. *See* Government's Sentencing Mem. 1, ECF No. 94 ("Gov't Sent. Mem.").[1] First, in August 2011, Elliott and an associate planned and successfully executed a jewelry store robbery. *Id.* at 1–2. During the robbery, Elliott's associate pointed a gun at the store's owner. *Id.* at 2. Also armed, Elliott helped to zip tie the owner by his wrists, and Elliott and his associate stole more than $200,000 in merchandise. *Id.* Next, in January 2012, Elliott attempted to rob another jewelry store. *Id.* Again, Elliott and an associate restrained

---

[1] In its sentencing memorandum filed in August 2018, the government acknowledged that Elliott's Presentence Investigation Report ("PSR") contained "a few mistakes" regarding the facts of the robberies. Gov't Sent. Mem. 1 n.1. I subsequently entered an order indicating that the government's sentencing memorandum amended the PSR's factual descriptions. *See* Order Modifying PSR, ECF No. 110; Gov't Br. in Opp. to Def.'s Mot. for Compassionate Release 1 n.1, ECF No. 129 ("Gov't Br."). Accordingly, I refer to the factual descriptions of the robberies as set forth in the government's sentencing memorandum.

the store's owner with zip ties, and the associate pointed a gun at the owner at close range; Elliott, too, carried a gun, as well as a Taser. *See id.* Elliott and his associate then jumped over the counter and led the owner to a back room, where Elliott grabbed him by his shirt and pushed him further into the room. *See id.* Finally, in May 2012, Elliott attempted to rob a third jewelry store. *See id.* During this attempted robbery, Elliott's associate shocked the store's owner with a Taser. *See id.*

In January 2018, Elliott pleaded guilty—pursuant to a plea agreement with the government—to possessing a firearm during and in relation to a crime of violence. Tr. of Pleading 9:14–10:5, ECF No. 115-2; Plea Agreement at 1–2, ECF No. 115-1. On October 18, 2018, I sentenced him to sixty months' imprisonment to be followed by three years of supervised release. *See* J. in Crim. Case 2–3, ECF No. 102. Elliott is currently in prison at FCI Danbury in Connecticut. *See* Summ. Reentry Plan Progress Report 1, ECF No. 131 ("Progress Report"). According to a document titled "Sentence Monitoring Computation Data" dated July 21, 2020 that Elliott submitted, his projected release date is March 29, 2023, taking into account seven days of jail credit. Sentence Monitoring Computation Data 2, ECF No. 131; *see* Progress Report 1.[2] In December 2019, I denied Elliott's motion to vacate his sentence pursuant to 28 U.S.C. § 2255. *See* Op. & Order, Dec. 2, 2019, ECF No. 116. In January 2020, I denied Elliott's motion for reconsideration of my order denying his § 2255 motion. *See* Op. & Order, Jan. 10, 2020, ECF No. 125.

Elliott now moves *pro se* for compassionate release under the First Step Act, 18 U.S.C. § 3582(c)(1)(A). He seeks an order reducing his sentence to time served or permitting him to serve the remainder of his sentence in home confinement. *See* Def.'s Mot. for Compassionate Release

---

[2] Elliott claims that he will be eligible for release to home confinement on September 29, 2022. Def.'s Mot. for Compassionate Release 8, ECF No. 128.

1, ECF No. 128 ("Def.'s Mot."). He argues that he is "at high risk for severe illness from COVID-19" because he has vitiligo, an autoimmune skin condition. *Id.* at 3; *see* Mayo Clinic, *Vitiligo* (last updated Apr. 10, 2020), https://www.mayoclinic.org/diseases-conditions/vitiligo/symptoms-causes/syc-20355912#:~:text=Vitiligo%20is%20a%20condition%20in,of%20skin%20color%20in%20patches. He also cites his long history as a cigarette smoker, his "respiratory issues; shortness of breath; [and] heart palpitations," and his "chronic sinus infections" as reasons justifying compassionate release in light of the COVID-19 crisis. Def.'s Mot. 3. Elliott also asserts that his bilirubin levels are three times higher than normal because of issues with his liver. *Id.* He claims to be "a chronic care inmate." *Id.* In additional documentation submitted in support of his motion, Elliott claims to have a body mass index ("BMI") of 33 and argues that such a BMI increases his risk of severe illness from COVID-19. *See* Progress Report 3. He adds that he is on a waiting list for a sonogram of his liver. *See* Fed. Bureau of Prisons U.S. Med. Ctr. for Fed. Prisons 1, ECF No. 131. Elliott argues that the conditions at his facility "make it impossible to practice physical distancing and protect oneself from infection." Def.'s Mot. 4. Elliott is thirty-three years old. *See* PSR at 2, ECF No. 87. The government opposes Elliott's motion. *See* Gov't Br. in Opp. to Def.'s Mot. for Compassionate Release, ECF No. 129 ("Gov't Br.").[3]

## STANDARD

---

[3] Elliott also claims that a criminal defense attorney has agreed to represent him in moving for compassionate release and sent me a letter inquiring whether that attorney had filed a motion on his behalf. *See* Letter, July 12, 2020, ECF No. 128-1. However, the correspondence that he attached from that criminal defense attorney refers only to a "potential representation[.]" Letter Re: Legal Representation, May 20, 2020, ECF No. 128-1. The government confirmed with the criminal defense attorney "that he did consult with the defendant but that he does not represent the defendant." Gov't Br. 3 n.2. This attorney did not, in fact, file a motion for compassionate release on Elliott's behalf. I decline to appoint an attorney to represent Elliott in this matter.

The First Step Act allows prisoners to move for compassionate release from prison when "extraordinary and compelling reasons warrant" such release. 18 U.S.C. § 3582(c)(1)(A)(i). The statute reads:

> the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i). Thus, there are four prerequisites to a court's granting compassionate release under the First Step Act. First, the defendant must have exhausted his administrative rights. § 3582(c)(1)(A). Second, the court must find that "extraordinary and compelling reasons warrant" release. § 3582(c)(1)(A)(i). Third, the court must consider the factors set forth in § 3553(a). Fourth, the court must find that release is consistent with the Sentencing Commission's policy statements.

The Sentencing Commission has issued a Policy Statement that defines "extraordinary and compelling reasons." U.S. Sentencing Guidelines Manual § 1B1.13 (U.S. Sentencing Comm'n 2018) ("USSG"); *see United States v. Ebbers*, 432 F. Supp. 3d 421, 427 (S.D.N.Y. 2020); *United States v. Bellamy*, No. 15-165(8) (JRT/LIB), 2019 WL 3340699, at *2 (D. Minn. July 25, 2019). Under this Policy Statement, in relevant part, "extraordinary and compelling reasons exist" based on the defendant's "medical condition" when "[t]he defendant is . . . suffering from a serious physical or medical condition, . . . suffering from a serious functional or cognitive impairment, or . . . experiencing deteriorating physical or  mental health because of the aging process[.]" USSG § 1B1.13 cmt. n.1(A)(ii). That medical condition must "substantially diminish[] the ability of the

defendant to provide self-care within the environment of a correctional facility," and it must be one "from which [the defendant] is not expected to recover." *Id.* Extraordinary and compelling reasons may instead exist if "[t]he defendant is suffering from a terminal illness[.]" *Id.* cmt. n.1(A)(i). Further, extraordinary and compelling reasons may instead exist based on the defendant's age, if "[t]he defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." *Id.* cmt. n.1(B). Finally, extraordinary and compelling reasons may exist if, "[a]s determined by the Director of the Bureau of Prisons, there exists . . . an extraordinary and compelling reason other than, or in combination with," the other listed reasons in the Guideline. *Id.* cmt. n.1(D). "[A]n extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." *Id.* cmt. n.2.

This Policy Statement "is at least partly anachronistic" because it predates the First Step Act itself. *Ebbers*, 432 F. Supp. 3d at 427. Some district courts have concluded that the court may make an "independent assessment" of whether "extraordinary and compelling reasons" for release are present, looking to the Policy Statement only for "guidance." *United States v. Beck*, 425 F. Supp. 3d 573, 579 (M.D.N.C. 2019); *see also United States v. Young*, No. 2:00-cr-00002-1, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) ("[T]he district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release."). *But see Ebbers*, 432 F. Supp. 3d at 427 (deeming Policy Statement "helpful in defining a vague standard" and concluding that its "descriptions of 'extraordinary and compelling reasons' remain current").

Even when a court determines that extraordinary and compelling reasons exist, it must

weigh those reasons against the 18 U.S.C. § 3553(a) factors. *See* 18 U.S.C. § 3582(c)(1)(A); *United States v. Weeks*, 16-CR-167 (LAP), 2020 WL 1862634, at *3 (S.D.N.Y. Apr. 14, 2020) ("Regardless of the theory of 'extraordinary and compelling reason' that a defendant proceeds under, the 18 U.S.C. § 3553(a) factors are relevant to whether compassionate release is warranted."); *United States v. Gotti*, 433 F. Supp. 3d 613, 615 (S.D.N.Y. 2020) ("The court confronted with a compassionate release motion is still required to consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances."). The § 3553(a) factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) [the kinds of sentences and sentencing range provided for in the USSG]
> (5) any pertinent [Sentencing Commission policy statement]
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

§ 3553(a).

The court must also consider whether release is consistent with the Sentencing Commission's policy statements. *See* § 3582(c)(1)(A)(i). In particular, it must determine that "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" USSG § 1B1.13(2). The § 3142(g) factors are largely duplicative of those in

§ 3553(a). *See* § 3142(g). In addition, they require the court to consider "whether the offense is a crime of violence," "the weight of the evidence against the [defendant]," and "the nature and seriousness of the danger to any person or the community that would be posed by the [defendant's] release." *Id.* § 3142(g)(1)–(4).

The defendant bears the burden of demonstrating that he is eligible for compassionate release. *See United States v. Rivernider*, 3:10-cr-222 (RNC), 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). Even if a defendant carries his burden, "[d]istrict courts have broad discretion in deciding whether to grant or deny a motion for a sentence reduction." *United States v. Tagliaferri*, 13 Cr. 115 (RA), 2019 WL 6307494, at *3 (S.D.N.Y. Nov. 25, 2019) (citing *United States v. Jefferson*, 662 F. App'x 36, 38 (2d Cir. 2016) (summary order) and *United States v. Rose*, 379 F. Supp. 3d 223, 225–26 (S.D.N.Y. 2019)).

## DISCUSSION

First, I assume that Elliott has exhausted his administrative rights. *See* 18 U.S.C. § 3582(c)(1)(A)(i). Elliott requested a reduction in sentence from the Bureau of Prisons and received a denial from his warden dated April 30, 2020. *See* Resp. to Inmate Req. to Staff Member, Def.'s Mot. at 15, ECF No. 128. He claims to have appealed this denial—twice, because he did not receive any response to the first appeal—and submitted documentation of administrative appeals dated May 13 and July 9, 2020. *See* Def.'s Mot. 2; Regional Administrative Remedy Appeals, Def.'s Mot. at 10–14. Because the government does not argue that Elliott has failed to satisfy the First Step Act's administrative exhaustion requirement, and because I deny Elliott's motion on other grounds, I assume that Elliott has satisfied the exhaustion requirement for the purpose of deciding the instant motion.

Elliott has not carried his burden to show that extraordinary and compelling reasons

warrant his release. First, Elliott's medical records do not support some of Elliott's claims about his health. Elliott claims to have a long history of smoking cigarettes and to "now have respiratory issues; shortness of breath; [and] heart palpitations." Def.'s Mot. 3 He does not cite any evidence of these conditions. In fact, his Bureau of Prisons medical records, which the government obtained in connection with its opposition to the instant motion, indicate that his "Respiratory System" was "Within Normal Limits" during a January 8, 2020 Health Services visit. *See* Medical Records 15, Gov't Br. Ex. A, ECF No. 130-1. On that same date, Elliott's general cardiovascular health was also recorded as "Within Normal Limits." *Id.* Elliott's medical records do not reference shortness of breath, heart palpitations, or a history of smoking. Further, although Elliott's PSR reports that he smoked marijuana in high school, it does not reference any history of cigarette smoking. *See* PSR ¶ 51. Elliott's PSR also indicates that he "advised that he has no history of physical health problems or treatment, which his fiancée and father corroborated." *Id.* ¶ 46. I acknowledge the possibility that Elliott now suffers from symptoms that the Bureau of Prisons has not documented. It is also true that the CDC's website provides that "[b]eing a current or former cigarette smoker may increase your risk of severe illness from COVID-19." Centers for Disease Control and Prevention, *People with Certain Medical Conditions* (last updated July 30, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#smoking ("CDC Website"). Nonetheless, without supporting evidence, I cannot conclude that Elliott has met his burden to show that his purported symptoms amount to extraordinary and compelling reasons for his release. *See United States v. Leigh-James*, No. 3:15-cr-188 (SRU), 2020 WL 4003566, at *7 (D. Conn. July 15, 2020) ("To the extent [defendant] suggests that his history as a smoker puts him at special risk, there is nothing in the record to suggest that his history of smoking (if he has one) has impacted his health."); *United States v.*

*Marsh*, No. 2:14-cr-83, 2020 WL 3989580, at *2 (D. Vt. July 15, 2020) (finding no extraordinary

or compelling reasons for compassionate release when defendant was not elderly and, despite his

smoking history, made no allegation of related disease); *United States v. Anguiera*, No. 11-CR-

116S (1), 2020 WL 3424530, at *6 (W.D.N.Y. June 23, 2020) (concluding that, absent any

objective evidence of a history of heavy smoking, defendant failed to establish increased risk from

COVID-19 based on history of smoking).

Elliott's claim that his elevated bilirubin level—which he attributes to "issues with [his]

liver"—increases the risk that COVID-19 poses to him similarly fails to rise to the level of an

extraordinary and compelling reason warranting release. Def.'s Mot. 3. The CDC does provide

that "[h]aving chronic liver disease, especially cirrhosis (scarring of the liver), may increase your

risk of severe illness from COVID-19." CDC Website, https://www.cdc.gov/coronavirus/2019-

ncov/need-extra-precautions/people-with-medical-conditions.html#liver-disease. Thus, in some

cases, documented chronic liver disease might constitute an extraordinary and compelling reason

for release. However, in this case, Elliott has not established that he has cirrhosis or any other

chronic liver disease. Documentation of recent Health Services visits indicates that "bilirubin is

very elevated" and "needs [follow up]." Medical Records 1, 3, 13–14, 35, 42, 44, 164. On June

10, 2020, a care provider entered a "Consultation Request[]" for an ultrasound based on Elliott's

"elevated bilirubin level and enlarged liver and palpable liver." *Id.* at 4. Although this provider

marked the request as "Urgent[,]" she entered a "Target Date" of September 10, 2020. *Id.* Health

Services assessed Elliott as having "[l]iver disease, unspecified[,]" "[e]levated liver enzymes[,]"

and "[l]iver enlargement[.]" *Id.* at 3. Elliott's medical records do not reveal a diagnosis of any

particular, chronic liver disease and show that the Bureau of Prisons is making ongoing efforts to

provide him with a diagnosis and care. As such, I cannot conclude that Elliott faces an increased

risk from COVID-19 based on his claims regarding his bilirubin level and liver.[4]

Elliott has not met his burden to show that any of his other asserted conditions amount to extraordinary and compelling reasons warranting his release. Although vitiligo is generally considered an autoimmune disorder, the National Institutes of Health ("NIH") website explains that it "is a condition that causes patchy loss of skin coloring (pigmentation)" and that "[i]n the absence of other autoimmune conditions, vitiligo does not affect general health or physical functioning." NIH U.S. Nat'l Libr. of Med., *Vitiligo* (July 28, 2020), https://ghr.nlm.nih.gov/condition/vitiligo. The CDC does not list vitiligo as a risk factor for severe illness from COVID-19. *See* CDC Website, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. Next, although Elliott's medical records document that Elliott reported in April 2020 "that he [was] prone to getting sinus infections[,]" they also document that, during that visit, he had "[n]o current nasal or sinus congestion[] . . . or sinus pain." Medical Records 8. His prior Health Services visit for a "sinus headache" occurred almost one year earlier, in May 2019. *See* Medical Records 77–78. I cannot conclude that Elliott faces any increased risk from COVID-19 based on this history of sinus symptoms. *See United*

---

[4] I do not give any weight to Elliott's claim that he is "a chronic care inmate[.]" Def.'s Mot. 3. Based on documentation that Elliott himself submitted, as of June 26, 2020, his care level was "CARE1[,]" described as "healthy or simple chronic care[.]" Progress Report 2. He has a mental health care level of "CARE1-MH[.]" *Id.* Elliott's "inmate profile[,]" obtained and submitted by the government, describes his care level and his mental health care level in the exact same way. *See* Inmate Profile, Gov't Br. Ex. B, ECF No. 130-2. According to the Bureau of Prisons, the "Care Level 1" designation describes inmates who "are less than 70 years of age and are generally healthy" and who "may have limited medical needs that can be easily managed by clinician evaluations every 6–12 months." Fed. Bureau of Prisons, *Care Level Classification for Medical & Mental Health Conditions or Disabilities* 2 (last updated May 2019), https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf. It is true that Elliott had a "Chronic Care Clinic encounter" at Health Services in January 2020, but this visit was for persistent shoulder pain and not for any of the purported conditions that Elliott cites in moving for compassionate release. Medical Records 15.

*States v. Wicker*, No. 3:20-cr-00006 (JAM), 2020 WL 2124522, at *1–2 (D. Conn. May 5, 2020)

(finding no exceptional or compelling reasons for release pending sentencing pursuant to 18 U.S.C.

§ 3145(c) or § 3142(i) when thirty-four-year-old defendant claimed to have severe sinus infection,

asthma, and fainting condition because "he ha[d] not substantiated his claim of any health

conditions that render[ed] him particularly susceptible to the COVID-19 virus"). Finally, I do not

find an extraordinary and compelling reason for release based on Elliott's assertion that his BMI

places him at an increased risk from COVID-19. *See* Progress Report 3. Elliott claims that his BMI

is "about 33[,]" but because he is five feet and seven-and-one-quarter inches tall, *see id.* at 1, 3,

and weighs 198 pounds, Medical Records 3, he actually has a BMI of 30.8, *see* Nat'l Heart, Lung,

& Blood Inst., *Calculate Your Body Mass Index* (last visited July 31, 2020),

https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm. It is true that, according

to the CDC, "[h]aving obesity, defined as a [BMI] of 30 or above, increases your risk of severe

illness from COVID-19." CDC Website, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-

precautions/people-with-medical-conditions.html#obesity; *see* Order at 1 n.1, *United States v.*

*Rodriguez*, No. 17-618 (E.D. Pa. July 13, 2020), ECF No. 47 (granting reconsideration of denial

of motion for compassionate release after CDC changed guideline to indicate that individuals with

BMIs over 30—rather than only those with BMIs over 40—face increased risk from COVID-19,

when defendant had BMI of about 35). However, because (1) Elliott's BMI is only slightly over

the at-risk threshold, (2) Elliott is only thirty-three years old, (3) he does not claim to have any

health complications related to his weight, and his medical records do not document any obesity-

related concerns, and (4) BMI does not necessarily convey a complete picture of one's health, I

decline to find an extraordinary and compelling reason for release based on Elliott's assertion

regarding his BMI alone. *See United States v. Osbourne*, No. 14-CR-6136-FPG, 2020 WL

11

3969364, at *1–2 (W.D.N.Y. July 14, 2020) (denying reconsideration of denial of compassionate release when defendant had BMI of 35.9, acknowledging that defendant faced increased risk from COVID-19 but reasoning that his risk factors were "likely shared by a significant portion of the federal prison population"); *United States v. Sanchez*, No. 16 Cr. 500 (RMB), 2020 WL 3790546, at *2–3 (S.D.N.Y. July 7, 2020) (denying compassionate release when defendant had BMI of 38.2 but his medical records did not show "any complications related to his BMI or weight" and Bureau of Prisons was managing his condition); *United States v. Sanchez*, No. 18-CR-833 (VSB), 2020 WL 2787654, at *5 (S.D.N.Y. May 29, 2020) (citing Nat'l Heart, Lung, & Blood Inst., *Assessing Your Weight and Health Risk* (last visited July 31, 2020), https://www.nhlbi.nih.gov/health/educational/lose_wt/risk.htm) (describing limits to utility of BMI metric, including that it may overestimate or underestimate body fat, and explaining that assessment of weight and health risk involves consideration of BMI, waist circumference, and risk factors for obesity-related diseases and conditions).

With proper documentation and medical diagnoses, some of the conditions that Elliott claims to have might rise to the level of extraordinary and compelling reasons for release in light of the COVID-19 pandemic. I also acknowledge that, despite the measures that the government explains that the Bureau of Prisons is taking to combat COVID-19, *see* Gov't Br. 5–7, prison remains a difficult place to practice social distancing and good hygiene, and the COVID-19 pandemic poses a real risk to this country's incarcerated population. This risk persists despite the fact that, as of this writing, the Bureau of Prisons reports only one inmate case and one staff case of COVID-19 at FCI Danbury. Fed. Bureau of Prisons, *COVID-19 Coronavirus* (last updated July 30, 2020), https://www.bop.gov/coronavirus/index.jsp. However, in this case, Elliott has not met his burden to show that extraordinary and compelling reasons justify his release.

Even assuming that Elliott did show that extraordinary and compelling reasons were present in this case, the § 3553(a) factors militate against his release. In particular, the nature and circumstances of Elliott's offenses are serious. *See* § 3553(a)(1). Elliott participated in one robbery and two attempted robberies. Gov't Sent. Mem. 1. He was armed. *See id.* at 2. He worked with an individual who pointed a gun at one jewelry store owner and shocked another with a Taser. *See id.* Elliott himself helped to restrain two store owners with zip ties and pushed one of these owners into a back room. *See id.* During the successful robbery, Elliott and his associate stole more than $200,000 in merchandise. *Id.* The violence of these offenses and the significant harm that they caused weigh against a reduction in Elliott's sentence. In addition, although I commend Elliott for maintaining employment and a clean disciplinary record in prison, these factors do not materially change my view of his history and characteristics. *See* § 3553(a)(1); Def.'s Mot. 3. Further weighing against a reduction in sentence is the fact that Elliott has already benefitted from lenience at sentencing; Elliott pleaded guilty to a lesser included offense pursuant to a plea agreement and received the minimum possible prison sentence required by statute. *See* 18 U.S.C. § 924(c)(1)(A)(i); Plea Agreement ¶ 1.b; Tr. of Pleading 15:7–12; PSR ¶ 12. A reduction in sentence in this case would not adequately reflect the seriousness of Elliott's offenses, deter similar criminal conduct, or protect the public. *See* § 3553(a)(2). Thus, an application of the § 3553(a) factors reveals that a reduction in Elliott's sentence is not justified.

## CONCLUSION

For the reasons set forth above, Elliott's motion for compassionate release is denied.

SO ORDERED.

Dated: July 31, 2020                           _____/s/_____
      Brooklyn, NY                                Allyne R. Ross
                                                          United States District Judge